1

2

3

4

5

6

7

8                            IN THE UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   STEVIN NOEL FAITH,

11           Petitioner,                          No. 2: 10-cv-1645 MCE GGH P[1]

12       vs.

13   KEN CLARK,

14           Respondent.                          FINDINGS AND RECOMMENDATIONS

15   _____/

16                          1.        INTRODUCTION

17           Petitioner, Stevin N. Faith, is a state prisoner proceeding with a petition for writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving an indeterminate

19   term of fifteen years to life following his 2006 conviction by jury trial in Butte County Superior

20   Court for second degree murder.  In addition, Petitioner admitted the truth of two prior strike

21   convictions.  Here, Petitioner challenges the constitutionality of his convictions.

22   \\\\\

23

24   _____

25       [1]This case was recently reassigned to the undersigned upon the retirement of recalled
     Magistrate Judge Sorrentino.

26                                          -1-

## II. CLAIMS

Petitioner presents several grounds for relief.  Specifically, the claims are as follow:

(1)    The trial court denied his right to present a complete defense by refusing to instruct the jury on the defense theory of the case.

(2)    The trial court's admission of prejudicial hearsay testimony by the victim's aunt violated his rights to confrontation and due process.

(3)    The trial court erred by permitting a prosecution expert witness to bolster the credibility of another prosecution expert witness.

(4)    The trial court erred by admitting into evidence a prejudicial photograph of the victim with her young child, in violation of his right to due process.

(5)    The cumulative effect of the above errors denied him due process of law.

Based on a thorough review of the record and applicable law, it is recommended that each of Petitioner's claims be denied.

## III. BACKGROUND

There is a background to the background of this case.  Petitioner was originally tried and convicted in 1981 for first degree murder for the crimes at issue here.  After exhausting direct review, a federal habeas was filed and assigned to the undersigned and District Judge David Levi.  Faith v. Hamlet, 2:00 cv 493 DFL (JKS) GGH.  Ultimately, the main issue in that first habeas was ineffective assistance of counsel in that no evidence was elicited by petitioner at his first trial that the cause of the victim's death was a regurgitation upon which she asphyxiated, i.e., not at petitioner's hands.  The prosecution had submitted evidence that the victim had asphyxiated, but associated that cause of death with strangulation – at petitioner's hands.  The undersigned held an evidentiary hearing at which the two main expert pathologists protagonists at issue in this habeas and underlying trial (Masters and Cooper) appeared.  The undersigned

-2-

1  found that defense counsel had acted unreasonably in not producing the regurgitation evidence to

2  which Dr. Cooper had testified to, but that the defense had not been sufficiently prejudiced.

3  However, District Judge Levi came to the opposite prejudice conclusion and the writ was

4  granted.  Respondent appealed, but eventually did not prosecute the appeal, and  petitioner was

5  retried in 2006 – the trial at issue here.  Dr. Masters and Dr. Cooper battled it out at the 2006 trial

6  on the theory which had been raised in the initial habeas.  Petitioner was again convicted, but this

7  time of second degree murder.  The court need not at this point detail the facts of trial, but will

8  supplement those facts as necessary in subsequent sections, especially in the section regarding

9  the alleged error of the prosecution calling an expert in rebuttal to opine on the "Kennedy-esque,"

10  impeccable, if not iconic, reputation of Dr. Masters for excellence in his work.  A basic summary

11  of the facts is sufficient at this point.

12          The basic facts of petitioner's crime were summarized in the unpublished opinion

13  of the California Court of Appeal, Third Appellate District, as follows:

14          In December, 1980, defendant met Debbie Cox, the victim, in a
15          bar.  He took her to a house that he knew was unoccupied, engaged
           in sexual activity with her, and strangled her.

16          At trial, witnesses described defendant's behavior on the days
17          surrounding the murder, the inconsistent statements he had given
           about events (including whether or not he knew the victim), and
18          incriminating remarks he had made.  On various occasions,
           defendant had told friends of his fantasy of raping and killing
19          women.

20          Forensic evidence disclosed that the victim had a blood alcohol
           level of .23 percent, and she had engaged in anal sex.  Two
21          pathologists testifying for the prosecution described in detail the
           injuries inflicted to the victim's neck, and they asserted that the
22          cause of death was asphyxiation associated with manual
           strangulation.  These pathologists discounted other possible causes
23          of death, including a blow to the neck or asphyxiation from
           aspiration of stomach contents.

24          Defendant denied killing the victim.  He asserted that the victim
           had picked him up at the bar and that the two went to the
25          unoccupied house, where they engaged in consensual sex.  When

26                                                  -3-

he left, the victim was passed out or sleeping.  He found the victim dead in the house when he returned there the next morning.

A pathologist testifying for the defense stated that the victim asphyxiated by aspirating stomach contents and that the death was accidental.  This pathologist criticized the opinions of the prosecution's experts and pointed out that some typical indications of manual strangulation were absent.  He believed the injuries to the neck were more consistent with a nonfatal blow to the neck.  Defendant stated that while it was possible that he grabbed the victim's neck or throat during sex, he did not think he did so hard enough to hurt her.  The pathologist also believed that the lack of trauma indicated that the victim had engaged in consensual anal sex.

In rebuttal, another pathologist critiqued the opinions of the defense pathologist and explained why he found them unconvincing.  This pathologist agreed with the findings of the other two pathologists who had testified for the prosecution.

The jury acquitted defendant of first degree murder but convicted him of murder in the second degree.  The court sentenced defendant to a prison term of 15 years to life . . . .
Lodged Doc. 4 at 2-3 (*People v. Faith*, 2009 WL 907215 (2009)

Petitioner timely appealed his conviction to the California Court of Appeal, Third Appellate District.  The court affirmed his conviction with a reasoned opinion on January 16, 2009.  He then petitioned for review of the appellate court's decision in the California Supreme Court.  The court denied review on April 2, 2009 without comment.  Petitioner filed his federal petition for writ of habeas corpus on June 28, 2010.  Respondent filed its answer on December 9, 2010 and Petitioner filed his traverse on January 31, 2011.

## IV.  APPLICABLE STANDARD OF HABEAS CORPUS REVIEW

The statutory limitations of federal courts' power to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be

-4-

granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As a preliminary matter, the Supreme Court has recently held and reconfirmed "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" Harrington v. Richter, 131 S.Ct. 770, 785 (2011). Rather, "when a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Id. at 784-785, citing Harris v. Reed, 489 U.S. 255, 265, 109 S.Ct. 1038 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id. at 785.

The Supreme Court has set forth the operative standard for federal habeas review of state court decisions under AEDPA as follows: "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Harrington, supra, 131 S.Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410, 120 S.Ct. 1495 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

1    decision." Id. at 786, citing Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140 (2004).

2    Accordingly, "a habeas court must determine what arguments or theories supported or . . could

3    have supported[] the state court's decision; and then it must ask whether it is possible fairminded

4    jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

5    decision of this Court." Id. "Evaluating whether a rule application was unreasonable requires

6    considering the rule's specificity.  The more general the rule, the more leeway courts have in

7    reaching outcomes in case-by-case determinations.'" Id. Emphasizing the stringency of this

8    standard, which "stops short of imposing a complete bar of federal court relitigation of claims

9    already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a

10   strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id.,

11   citing Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166 (2003).

12            The undersigned also finds that the same deference is paid to the factual

13   determinations of state courts.  Under § 2254(d)(2), factual findings of the state courts are

14   presumed to be correct subject only to a review of the record which demonstrates that the factual

15   finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in

16   light of the evidence presented in the state court proceeding."  It makes no sense to interpret

17   "unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in

18   § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the

19   same record could not abide by the state court factual determination.  A petitioner must show

20   clearly and convincingly that the factual determination is unreasonable.  See Rice v. Collins, 546

21   U.S. 333, 338, 126 S.Ct. 969, 974 (2006).

22            The habeas corpus petitioner bears the burden of demonstrating the objectively

23   unreasonable nature of the state court decision in light of controlling Supreme Court authority.

24   Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).  Specifically, the petitioner "must

25   show that the state court's ruling on the claim being presented in federal court was so lacking in

26                                          -6-

justification that there was an error well understood and comprehended in existing law beyond

any possibility for fairminded disagreement." Harrington, supra, 131 S.Ct. at 786-787. "Clearly

established" law is law that has been "squarely addressed" by the United States Supreme Court.

Wright v. Van Patten, 552 U.S. 120, 125, 128 S.Ct. 743, 746 (2008). Thus, extrapolations of

settled law to unique situations will not qualify as clearly established. See e.g., Carey v.

Musladin, 549 U.S. 70, 76, 127 S.Ct. 649, 653-54 (2006) (established law not permitting state

sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear

prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly

established law when spectators' conduct is the alleged cause of bias injection). The established

Supreme Court authority reviewed must be a pronouncement on constitutional principles, or

other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on

federal courts. Early v. Packer, 537 U.S. 3, 9, 123 S. Ct. 362, 366 (2002).

     The state courts need not have cited to federal authority, or even have indicated

awareness of federal authority in arriving at their decision. Early, supra, 537 U.S. at 8, 123 S.Ct.

at 365. Where the state courts have not addressed the constitutional issue in dispute in any

reasoned opinion, the federal court will independently review the record in adjudication of that

issue. "Independent review of the record is not de novo review of the constitutional issue, but

rather, the only method by which we can determine whether a silent state court decision is

objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

## V. DISCUSSION

**A. Refusal to Instruct on Involuntary Manslaughter Theory**

     Petitioner claims that the trial court's refusal to instruct the jury on unlawful act

involuntary manslaughter deprived him of his rights to due process, a fair trial, and to present a

complete defense. He argues that unlawful act involuntary manslaughter was the only theory of

involuntary manslaughter justified by the record facts. The California Court of Appeal, Third

1  Appellate District, considered and rejected petitioner's claim on direct appeal, explaining as

2  follows:

> Involuntary manslaughter is an unlawful killing committed without an intent to kill and without conscious disregard for human life, and is a lesser included offense of murder. (*People v. Lewis* (2001) 25 Cal.4th 620, 645; CALCRIM No. 580.) Involuntary manslaughter may be committed in two ways: "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (Pen. Code, § 192, (b).)
>
> In the present case, defendant sought instructions on both theories of involuntary manslaughter. First, he asserted he was entitled to an instruction on involuntary manslaughter based on the commission of a lawful act with criminal negligence because evidence demonstrated that he might have negligently choked the victim too hard during a lawful act of sex. The trial court agreed and gave an instruction on this lesser included offense.
>
> Second, defendant requested an instruction on involuntary manslaughter based on the commission of an unlawful act that posed a high risk of death or great bodily injury. Defendant pointed to the testimony of Dr. Cooper, who had opined that the victim's injuries were caused by a blow to the neck. Defendant argued that this evidence was sufficient to warrant an instruction on involuntary manslaughter based on the commission of an unlawful act.
>
> The trial court refused to instruct on this theory of involuntary manslaughter. On appeal, defendant asserts that this decision was erroneous and compels reversal. We disagree.
>
> "It is of course the rule that the court is under no duty to give a requested instruction when there is no substantial evidence in support." (*People v. Hendricks* (1988) 44 Cal.3d 635, 643.) However, "a trial court errs if it fails to instruct . . . on all theories of a lesser included offense which find substantial support in the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is '"evidence from which a jury composed of reasonable [persons] could . . . conclude [ ]"' that the lesser offense, but not the greater, was committed." (*Ibid.*)
>
> We agree with the trial court that there was no substantial evidence to support the instruction on involuntary manslaughter predicated on the commission of an unlawful act posing a high risk of death or great bodily

injury.  Defendant denied having a fight or argument with the victim.
When asked whether it was possible that he touched or grabbed the victim
around the neck or throat while having sex with her, defendant responded,
"It's possible.  I don't think that I - - that I grabbed her hard enough to hurt
her."  Given this testimony, there is no evidence that defendant committed
an act that posed a high risk of death or great bodily injury, and therefore
the requested instruction was properly refused.

Perhaps more importantly, although the defense pathologist believed a
single blow to the victim's neck had been inflicted, he did not link this
blow to the death of the victim.  In fact, Dr. Cooper testified that this blow
was *unrelated to* the cause of death, which he determined to be asphyxia
from aspirating stomach contents.

Despite the lack of a causal link between any blow to the neck and the
victim's death, defendant attempts to cobble together evidence to fit this
theory by asserting that the jury could reasonably have believed (a) Dr.
Cooper's testimony that a single blow to the neck occurred *and* (b) the
testimony of the prosecution's witnesses that death occurred from the
injuries to the neck.  Under this scenario, the unlawful blow could have
caused the victim's death.

Defendant mixes proverbial apples and oranges.  The theories presented by
opposing experts were separate and distinct and no trier of fact could
reasonably have melded them together in the manner defendant suggests.
The prosecution's expert witness believed that the cause of death was
asphyxia associated with manual strangulation, not a blow, and they
explained at length why they believed that strangulation had occurred.
The defense expert testified that the victim had died from aspirating
stomach contents.  There was no evidence the victim died from a blow to
the neck, and therefore there was no basis to instruct on the unlawful act
theory of involuntary manslaughter.

In any event, the factual question posed by the omitted instructions was
decided adversely to defendant under other properly given instructions.

The court instructed the jury that murder requires malice aforethought, that
is, defendant intended to kill or knowingly committed an act dangerous to
human life with conscious disregard for human life.  (CALCRIM No.
520.)  The court contrasted this situation with involuntary manslaughter, a
crime that occurs without malice aforethought, "[w]hen a person commits
an unlawful killing but does not intend to kill and does not act with
conscious disregard for human life."  (CALCRIM No. 580; Pen. Code §
192, subd. (b).)

In convicting defendant of second degree murder, the jury necessarily
found that defendant acted with malice aforethought.  That finding made a
verdict on a lesser included offense of involuntary manslaughter
impossible.  By definition, involuntary manslaughter involves the *absence*

-9-

1   of malice.  Any error in failing to instruct on the full range of involuntary
2   manslaughter theories was therefore harmless.  (*People v. Lewis*, *supra*, 25
    Cal.4th at p. 646; *People v. DeJesus* (1995) 38 Cal.App.4th 1, 21-22;
3   *People v. Polley* (1983) 147 Cal.App.3d 1088-1092.)

4   Lodged Doc. 4 at 15-18.

5          Here, the instruction in question is a lesser included offense instruction.  In a non-

6   capital case, such as petitioner's, the "[f]ailure of a state court to instruct on a lesser offense fails

7   to present a federal constitutional question and will not be considered in a federal habeas corpus

8   proceeding."  Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984) (internal quotations

9   omitted).  See also Beck v. Alabama, 447 U.S. 625, 638 & n. 7 (1980) (holding that failure to

10  instruct on lesser included offense in a *capital* case is constitutional error if there was evidence to

11  support the instruction, but expressly reserving "whether the Due Process Clause would require

12  the giving of such instructions in a non-capital case"); Solis v. Garcia, 219 F.3d 922, 929 (9th

13  Cir. 2000) (in non-capital case, failure of state court to instruct on lesser included offense does

14  not alone present a federal constitutional question cognizable in a federal habeas corpus

15  proceeding); Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998) (failure of state trial court

16  to instruct on lesser included offenses in non-capital case does not present federal constitutional

17  question).

18         The Ninth Circuit, however, has noted that there might exist an exception to this

19  general rule for adequate jury instructions on a defendant's theory of defense.  Solis, 219 F.3d at

20  929.  Even assuming the existence of a "theory of defense" exception such that failure to instruct

21  on a lesser included offense raises a federal issue, it is not applicable in this case.  As the state

22  appellate court reasonably explained, the requested involuntary manslaughter instruction based

23  on an unlawful act was not warranted because it lacked foundation in the evidence.  See Keeble

24  v. U.S., 412 U.S. 205, 208 (1973) (lesser included offense instruction required only "if the

25  evidence would permit a jury rationally to find [a defendant] guilty of the lesser offense and

26                                          -10-

1  acquit him of the greater"); Conde v. Henry, 198 F.3d 734, 739 (9th Cir. 1999) (in order to merit

2  a lesser included offense instruction based on a theory of defense, the theory in question must be

3  supported by the law and have some foundation in evidence); People v. Mendoza, 24 Cal.4th

4  130, 174 (2000) (lesser included offense instruction must be given only when the evidence

5  warrants it).  The trial court in this case did give an involuntary manslaughter instruction based

6  on the a lawful act committed with criminal negligence.  This instruction was supported by the

7  record based on the petitioner's sexual encounter with the victim, a lawful act, the prosecution

8  experts' testimony that the cause of death was strangulation, and the defense theory that

9  petitioner could have accidentally strangled the victim to death.

10          Conversely, a jury instruction based on an unlawful act was not supported by the

11  record evidence.  If the jury believed petitioner's testimony from his first trial, read into the

12  record at his second trial, and the defense expert testimony, while the victim had suffered a blow

13  to the neck, the actual cause of death was asphyxia from aspirating stomach contents.  If the jury

14  believed the prosecution's experts, the victim died from strangulation.  Neither the prosecution or

15  the defense evidence supported the theory that the victim died as a result of an unlawful blow to

16  the neck.  Accordingly, to the extent that petitioner's argument is based solely upon the trial

17  court's failure to give a lesser included offense instruction on one defense theory of the case, he

18  is not entitled to federal habeas corpus relief.   Far from being an unreasonable interpretation of

19  the record, the Court of Appeal decision makes perfect sense.

20  **B.  Hearsay Testimony of Victim's Aunt**

21          Petitioner claims that the trial court violated his constitutional rights to due

22  process and to confront witnesses against him by permitting the victim's aunt and best friend,

23  Peggy Frost, to testify that the victim had previously expressed an aversion to anal intercourse

24  and to opine that she did not believe the victim would have consented to having anal intercourse

25  with petitioner.  Petitioner argues that such testimony constituted inadmissible hearsay and

26

allowed the jury to infer that the anal intercourse he engaged in with the victim on the night of

her death was not consensual and that she was, in fact, raped and killed by him.  The California

Court of Appeal, Third Appellate District, considered and rejected petitioner's claim on direct

appeal, explaining as follows:

> Defendant contends that the trial court erred in permitting evidence relating to the victim's purported sexual preferences.  Any error was harmless.

> One of the witnesses at trial was the victim's aunt, Peggy F.  Peggy was only one year older than the victim and the two had been best friends.  Over defendant's objection, Peggy described an incident that occurred shortly before the victim got married.  The women were looking at a sex manual and when they got to a page about anal sex, they "were both going, oh, my god, you know, no way.  It's bad enough to have a bowel movement without somebody sticking . . . ."  The prosecutor asked Peggy whether she had an opinion about whether the victim would have engaged in consensual anal intercourse.  Peggy replied: "No, she wouldn't.  Debbie was - - really she was more straight laced than me.  We were both very sheltered, raised in Christian homes."  Peggy said the two had conversations about sex over subsequent years, had talked about anal sex, and had said "we didn't want it."

> The trial court permitted this testimony, apparently under the provisions of Evidence Code section 1103, subdivision (a).  That statute provides that "evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by [the general ban against character evidence] if the evidence is: [¶] (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character.  [¶] (2) Offered by the prosecution to rebut evidence adduced by the defendant under paragraph (1)."

> Defendant contends that this statute was inapplicable because the evidence was not being offered by the prosecution to rebut character evidence that defendant had adduced.

> The prosecutor presented Peggy's testimony in its case-in-chief.  Defendant had not yet presented any evidence about the victim's character, and defense counsel repeatedly stated that he had no intention of doing so.  Because no such evidence had been introduced, there was nothing for the prosecutor to rebut, and the provisions of Evidence Code section 1103, subdivision (a) (2) did not, at that point, come into play.  It was therefore error to admit, *at that point in the trial*, Peggy's testimony regarding the victim's aversion to anal intercourse.  Even so, because in this matter there

has been no miscarriage of justice, we will not reverse the judgment in the trial court based on this error.

Article VI, section 13 of the California Constitution provides in part: "No judgment shall be set aside . . . in any cause, on the ground of . . . the improper admission . . . of evidence . . . unless, after an examination of the entire case, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." For the reasons that follow, we find no miscarriage of justice here.

To frame our discussion, a brief recitation of the somewhat unusual procedural aspects of the presentation of the People's case will be helpful.

As noted earlier, defendant was originally tried for the murder of Debbie Cox in 1981. The case now before us was a retrial of the original charges undertaken after the federal court issued a writ of habeas corpus. Defendant testified in his own defense during the 1981 trial.

In this case, the prosecution was permitted to read into evidence during its case-in-chief the direct examination testimony of the defendant given at his first trial. That testimony included claims by the defendant that he and the victim engaged in consensual anal intercourse but that he had not killed her. Defendant's credibility - - the believability of his denial that he killed Debbie Cox - - - was thereby, and at the time of the reading of his prior testimony, placed in issue. Arguably, if the prosecution could show that defendant lied about the act of consensual anal sex when he testified in the earlier trial, that would tend to prove that he also lied about not having killed her, suggesting that in fact he was guilty of the murder. Thus the victim's claimed consent to an act of anal intercourse became an issue in the case.

As noted earlier, Evidence Code section 1103, subdivision (b) allows for the admissibility of character evidence when it is "[o]ffered by the prosecution to rebut evidence adduced by the defendant . . . ." (Evid. Code, § 1103, subd. (a) (2).) "Character evidence" has been defined as "an emotional, mental, or personality fact constituting a disposition or propensity to engage in a certain type of conduct." (2 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 3d ed. 2008) Evidence of Character, Habit and Custom, § 33.1, p. 732.) Thus, once defendant presented evidence (through his testimony in the first trial) that the victim consented to anal intercourse, the prosecution's evidence concerning the victim's apparent aversion to anal intercourse would have been admissible pursuant to Evidence Code section 1103, subdivision (a) (2).

We recognize that, at the time the aunt testified to the victim's state of mind regarding anal sex, the consensual or non-consensual nature of that act on the night in question had not technically become an issue in the case because the prosecution did not read the defendant's prior testimony into the record until after the aunt testified. But this is of no particular

-13-

moment.  Done by the book, at most, the aunt would initially have testified only to other matters and then would have been recalled to testify to the victim's views about anal intercourse after the defendant's testimony was read into the record.  Ultimately, the testimony would have become admissible.

We observe that Evidence Code section 1250 provides the evidence of a statement of a declarant's then existing state of mind is not made inadmissible by the hearsay rule if it is offered to prove the declarant's state of mind when that state of mind is an issue in the action.  As noted, the victim's consent to anal intercourse became an issue in the case and hearsay testimony to the effect that she would never have consented to such sexual activity showed her state of mind on that issue and was evidence in turn that, contrary to defendant's claims, she had not consented to the act.  This then would have been a second basis for admitting the testimony.  And, once again, the timing of the presentation of the prosecution's "rebuttal" evidence, under the circumstances presented here, is of no particular significance.

Given all of the above, the court's error in admitting this evidence apparently pursuant to Evidence Code section 1103, subdivision (a) was harmless under any standard (*Chapman v. California* (1967) 386 U.S. 18, 24 [L.Ed.2d 705, 710-711]; *People v. Watson* (1956) 46 Cal.2d 818, 836) and did not result in a miscarriage of justice.

Lastly, regarding this testimony, defendant also argues that its admission violated his "federal constitutional right to confrontation" citing for some support *Idaho v. Wright* (1990) 497 U.S. 805, 814-815 [111 L.Ed.2d 638, 651-652].  *Wright* was a case that dealt with Idaho's "residual hearsay exception" and the Court found that, applying the holding in *Ohio v. Roberts* (1980) 448 U.S. 56 [65 L.Ed.2d 597], application of that exception to the facts of that case violated the Confrontation Clause of the United States Constitution.  Defendant does not develop the argument further.

We consider only those arguments sufficiently developed to be cognizable. (*People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2.)  "To the extent defendant perfunctorily asserts other claims, without development and, indeed, without a clear indication that they are intended to be discrete contentions, they are not properly made, and are rejected on that basis." (*Ibid*.)

We note that the victim's testimony concerning anal intercourse was not "testimonial" as that term is used in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177] and thus *Crawford* has no application here.

Lodged Doc. 4 at 4-9.

\\\\\\

-14-

The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right to be confronted with the witnesses against him.[2] U.S. CONST. AMEND. VI. This right, extended to the States by the Fourteenth Amendment, includes the right to cross-examine witnesses.  Cruz v. New York, 481 U.S. 186, 189 (1987) (internal citations omitted). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."  Lilly v. Virginia, 527 U.S. 116, 124 (1999) (internal quotations omitted).  See also Davis v. Alaska, 415 U.S. 308, 315 (1974) (the  Confrontation Clause secure's a criminal defendant's the right to cross-examination).  In 2004, the United States Supreme Court held that the Sixth Amendment's Confrontation Clause is violated by the admission into evidence of out-of-court statements which are testimonial in nature unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. Crawford v. Washington, 541 U.S. 36, 68 (2004).  The Court rejected such statements, regardless of their demonstrated reliability, on the grounds that "dispensing with confrontation because testimony is obviously reliable is akin to dispensing with a jury because a defendant is obviously guilty.  This is not what the Sixth Amendment proscribes."  Id. at 62.

While the Crawford Court specifically left "for another day any effort to spell out a comprehensive definition of 'testimonial,'" it gave examples.  "Whatever else the term covers, it applies at minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."  Id. at 68.  The rule proscribed by Crawford, of course, applies only to hearsay statements that are testimonial in nature and, therefore, does not prohibit admission of non-testimonial hearsay statements.  See Giles v. California, 554 U.S. 353, 376

_____

[2] A witness is considered to be a witness "against" a defendant for the purposes of the Confrontation Clause if his testimony "is part of the body of evidence that the jury may consider in assessing his guilt."  Cruz, 481 U.S. at 190.

1  (2008) ("[O]nly *testimonial* statements are excluded by the Confrontation Clause.") (emphasis in

2  original); Whorton v. Bockting, 549 U.S. 406, 420 (2007) ("[T]he Confrontation Clause has no

3  application to" an "out-of-court non[-]testimonial statement.").  Indeed, with respect to

4  statements that are non-testimonial, the Court has stated that "it is wholly consistent with the

5  Framers' design to afford the States flexibility in their development of hearsay laws . . . as would

6  an approach that exempted such [non-testimonial] statements from Confrontation Clause scrutiny

7  altogether.  Id.  See also Davis v.Washington, 547 U.S. 813, 821 (2006) (only "testimonial

8  statements" implicate the Confrontation Clause and Crawford's holding); Ponce v. Felker, 606

9  F.3d 596, 600 n.2 (9th Cir. 2010) ("Not all out-of court statements are 'testimonial," and the

10  Confrontation Clause does not apply to non-testimonial statements." (citing Whorton, 549 U.S.

11  at 420)).

12            On the facts in this case, the statements made by the victim were not testimonial

13  in nature because they were not made "under circumstances that would lead an objective witness

14  reasonably to believe that [they] would be used at a later trial."  U, 387 F.3d 1030, 1037 (9th Cir.

15  2004).  See also Crawford, 541 U.S. at 52.  There is no evidence in the record suggesting that the

16  victim made the statements for the purpose of supplying evidence to the prosecution.  To the

17  contrary, the conversation was between two private individuals, without any active participation

18  by a government official.  See Giles, 554 U.S. at 376 ("Statements to friends and neighbors . . .

19  would be excluded, if at all, only by hearsay rules . . . .").  The statements were not contained in

20  formalized documents, such as affidavits, depositions, or prior testimony transcripts, and were

21  not made as part of a confession resulting from custodial interrogation.  Because the victim's

22  statements were non-testimonial in nature, the Confrontation Clause did not prohibit their

23  admission at petitioner's trial.  See Whorton, 549 U.S. 406, 420 (2007) ("Under Crawford . . . the

24  Confrontation Clause has no application to [out-of-court non-testimonial] statements and

25  therefore permits their admission, even if they lack indicia of reliability."  Thus, the state

26                                          -16-

1   appellate court's determination that the victim's statements regarding her aversion to anal

2   intercourse were non-testimonial and therefore did not implicate the Confrontation Clause was

3   not contrary to or an unreasonable application of clearly established Supreme Court law.

4          To the extent that petitioner's claim is premised upon an alleged error by the trial

5   court in its application relevant portions of the California Code of Evidence, no relief can be

6   granted because this alleges only a violation of state law.  Estelle v. McGuire, 502 U.S. 62, 67-68

7   (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations

8   on state law questions.").  Here, the California Court of Appeal, Third Appellate District,

9   concluded that the statements were admissible under sections 1103 and 1250 of the California

10  Evidence Code as exceptions to the general prohibition against reliance upon hearsay evidence.

11  The interpretation of the state appellate court of California evidentiary law may not be disturbed.[3]

12         Petitioner is not entitled to federal habeas corpus relief on this claim.

13  **C.  Expert Witness Testimony**

14         Petitioner claims that the trial court improperly permitted one prosecution expert

15  witness to offer testimony which bolstered the credibility of another prosecution expert witness,

16  in violation of his federal right to due process of law.  Respondent contends that petitioner's

17  claim is procedurally defaulted for failure to raise an adequate objection to the testimony at trial,

18  and that it should fail on the merits in any event.  Judge Sorrentino, when this case was assigned

19  to her,  ordered the parties to file supplemental briefs on this issue.  The parties timely filed

20  instructive briefs.

21  \\\\\

22  _____

23         [3]The Court of Appeal opinion on the matter of character evidence is somewhat boot
    strappish.  Under California law, the prosecution may introduce rebuttal character evidence if the
24  defense has introduced *character* evidence.  The matter of testified-to consent does not appear to be
    a matter of character.  However, this error, if indeed it is one, is a matter of state law not subject to
25  adjudication here.

26                                                -17-

1    The California Court of Appeal, Third Appellate District, considered and rejected

2 petitioner's claim on procedural grounds, explaining as follows:

3

> Defendant contends that one prosecution expert witness impermissibly
> vouched for another.

4

5

> Two pathologists, including Dr. Joseph Masters, testified as expert
> witnesses in the prosecution's case-in-chief and described the cause of
> death as asphyxia associated with manual strangulation.  Defendant

6

> presented the contrary testimony of another pathologist, Dr. John Cooper,
> who opined that the victim died from aspirating stomach contents.

7

8

> In rebuttal, another pathologist, Dr. Tom Resk, concurred with the findings
> of the prosecution's other pathologists.  When asked about Dr. Master's
> reputation in the community, Dr. Resk responded, "Dr. Masters, among

9

> the forensic community, is considered - - essentially equivalent to a John.
> F. Kennedy in terms of his integrity, competence and ability.  For younger

10

> folks in the jury, probably that don't know about John F. Kennedy, don't
> have the same feeling, probably better to think of Dr. Masters as Obi Wan

11

> Kenobi . . . in Star [Wars]."  He concluded that Dr. Masters "basically is a
> very competent individual," and stated that when Dr. Masters determined

12

> that certain physical findings were present, "[y]ou can bank on it."

13

> Defense counsel objected to Dr. Resk's testimony comparing Dr. Masters
> to President Kennedy and Obi Wan Kenobi, asserting that this testimony

14

> constituted "inadmissible vouching for the credibility of another
> prosecution witness."  The court responded, "It cuts both ways.  It may

15

> tend to show that he would have the tendency to rely too much on Dr.
> Masters' testimony and give it way too much weight.  If you want the jury

16

> admonished to disregard it, I am happy to do that."  Defense counsel
> responded, "That's what I am asking for, Your Honor.  Thank you."

17

18

> When the prosecutor voiced concerns, the court stated, "I am just saying
> that [Dr. Resk] can indicate that he puts credence in what Dr. Masters said
> without comparing him to John F. Kennedy.  He's already said it.  I would

19

> be toning it down a little bit."  The court added, "He can testify that he
> places great weight on Dr. Masters' opinions because of his great respect

20

> for Dr. Masters personally."

21

> After further comments, defense counsel cautioned, "[W]hat I see coming
> is [the prosecutor] asking Dr. Resk [about] his knowledge of Dr. Cooper's

22

> reputation."  The prosecutor replied, "I don't intend to."  The court asked,
> "Can we leave it at that?  We will leave the testimony in, and I won't

23

> comment on it with the jury."  Defense counsel did not say anything in
> response.

24

25

> On appeal, defendant renews his claim that Dr. Resk's comparison of Dr.
> Masters to President Kennedy and Obi Wan Kenobi constituted

26
-18-

impermissible vouching for another expert witness.  Defendant has forfeited any claim of error.

Generally, an appellate court will not consider matters where an objection that could have been made was not presented to the trial court.  These circumstances may involve intentional acts or acquiescence constituting waiver or estoppel, but often it is simply a matter of fairness: a party should not be permitted to take advantage of an error that could have been easily corrected at the trial level.  (*People v. Saunders* (1993) 5 Cal.4th 580, 589-590; *In re Dakota S.* (2000) 85 Cal.App.4th 494, 501.)

That is precisely the case here.  The trial court had expressed its willingness to admonish the jury to ignore Dr. Resk's comparisons.  After more discussion, the court asked if it could leave the matter as it stood, without saying anything more to the jury, and defense counsel did not respond.  This acquiescence forfeits any claim of error on appeal.  There is no evidence to bear out defendant's claim that any further objection would have been futile.

Moreover, as we have noted, Dr. Resk was of the opinion that the cause of the victim's death was asphyxia from manual strangulation and he disagreed with Dr. Cooper's opinion that the victim died from aspirating stomach contents.  Among other things, Dr. Resk testified that Dr. Cooper "was incorrect" in discounting the medical significance of petechiae in the dura of the brain.  In reaching his conclusion about the cause of death, Dr. Resk repeatedly relied on the report and the opinion of Dr. Masters who was also of the opinion that the victim's cause of death was asphyxia from manual strangulation.  It was readily apparent that Dr. Resk's opinion was influenced by the reputation that Dr. Masters had in the medical community.  Thus, it was proper for the trial court to allow Dr. Resk to explain why, in the court's words, Dr. Resk "place[d] great weight on Dr. Master's opinion because of his great respect for Dr. Masters personally" as opposed to agreeing with Dr. Cooper.  This was not an improper vouching for the opinion of another expert; it was simply explaining why the other expert's opinion was an important component of Dr. Resk's conclusion regarding the cause of death.

We note also that other evidence also demonstrated Dr. Resk's strongly favorable views of Dr. Master[s].  For example, Dr. Resk testified that he could "bank on" Dr. Masters' findings, and defendant raised no objection to this statement.  Moreover, as the court pointed out, the high regard in which Dr. Resk held Dr. Masters "cut [ ] both ways" and might also have affected Dr. Resk's ability to assess Dr. Masters' work in a critical and impartial manner.

There was no error.

Lodged Doc. 4 at 9-12.

1

### 1.  Procedural Default

2            The trial transcript set out fully the background to the appellate cout's imposition

3   of a procedural bar.

4   Q.      We will get to the congestion in a moment, but you've talked on several levels here about
            the inexperienced (sic?)pathologist.  Did you know Dr. Masters, or of Dr. Masters?

5

6   A.      I certainly knew of Dr. Masters.  Yes, sir.

    Q.      What was Dr. Masters reputation?

7

8   A.      I always have to - - since I have achieved a certain age, and my daughters, I have to select
            my metaphors a little differently.  As I look out and scan the jury, I see folks about my
9           age, and I see folks a lot younger than me, about my daughter's age.  I will use two
            examples; one is John F. Kennedy, and those of us of a certain age - -

10  [DEFENSE COUNSEL]:            Your Honor, object, move to strike, nonresponsive to the question.

11  THE COURT:                    He's answering the question.

12  [THE PROSECUTOR]:             He's answering the question as to Dr. Masters' reputation in the
                                  community.

13

14  [DEFENSE COUNSEL]:            Okay.  Then he can answer that part, but we don't need a dialogue
                                  about J.F. Kennedy.

15  THE COURT:                    It's appropriate.  Overruled.

16  THE WITNESS:                  Dr. Masters, among the forensic community, is considered - -
                                  essentially equivalent to a John F. Kennedy in terms of his
17                                integrity, competence and ability.  For younger folks in the jury,
                                  probably that don't know about John F. Kennedy, don't have the
18                                same feeling, probably better to think of Dr. Masters as Obi Wan
                                  Kenobi, which my daughters, the last of the great Jedi warriors
19                                portrayed by Alec [Guiness] in Star Trek.

20  THE COURT:                    Star Wars.

21  THE WITNESS:                  Star Wars - - thank you very much.  He basically is a very
                                  competent individual.  I've worked with his group on a number of
22                                cases.  I worked with his former partner before they both retired,
                                  Pat Rooney, a child abuse case out of Glenn County 25 years ago.

23
                                  He criticized my report, and I found valuable information that he
24                                was able to give me.  Pat Rooney and Dr. Masters also shared some
                                  of their board studying examinations, kind of equivalent to a board
25                                bar examination study materials when I took my certification

26                                              -20-

1          exams in forensic pathology.  That's the answer to your question.

2   BY [THE PROSECUTOR]:

3       Q.      True that in part of Dr. Masters' stellar reputation was also gained in the Juan
                Corona case?

4

5   [DEFENSE COUNSEL]:          Your honor, I object to all of these questions eliciting from Dr.
                                Resk his knowledge of Dr. Masters' reputation.  Dr. Resk is here to
                                inform the jury of his findings in light of his review, and I believe
6                               all of this is inappropriate and irrelevant.

7   THE COURT:                  I don't think we need to go into the Juan Corona case.

8   [THE PROSECUTOR]:           Okay.

9   BY [THE PROSECUTOR]:

10      Q.      Now, when you say that Dr. Masters is the Obi Wan Kenobi, did that color your
                independent review of his information?

11

12      A.      No, absolutely not.

13  [DEFENSE COUNSEL]:          Then - - excuse me.  Then I move to strike all of the testimony
                                about his reputation in the community.  It played no part in the
                                formation of his opinion.

14

15  THE COURT:                  Overruled.

16  [THE PROSECUTOR]:           Thank you.

17  BY [THE PROSECUTOR]:

18      Q.      You heard Dr. Cooper indicate that doctor - - he felt that Dr. Masters did a good
                job in his observations of what was there at the autopsy that Dr. Cooper wasn't at,
                but Dr. Masters was, did you not?

19

20      A.      Yes, sir.

21      Q.      And so based upon the reputation that Dr. Masters has in the pathological
                community, when he says something is a petechiae, would it be your opinion that
                it's petechiae rather than some artifact?

22

23      A.      You can bank on it.

24  RT at 1331-1334.

25  /////

26                                              -21-

Following a few more questions by the prosecutor, the jury was dismissed from the courtroom for

a short recess.  At this point, defense counsel renewed his objections to Dr. Resk's testimony

regarding Dr. Masters' reputation, and the following exchange took place on the record:

THE COURT:                    On the record.

[DEFENSE COUNSEL]:            Thank you, judge.  I would like to renew my
                             objection to Dr. Resk's testimony about Dr. Masters
                             being like JFK and Obi Wan Kenobi.  It's clearly
                             outside the scope of his expertise.  What it is is
                             inadmissible vouching for the credibility of another
                             prosecution witness.

                             If there is one thing that's clear in California law
                             regarding expert testimony, it's that a witness
                             cannot do  that, and I would ask the court again to
                             strike that portion of his testimony, which really is
                             quite inappropriate.

THE COURT:                    It cuts both ways.  It may tend to show that he
                             would have the tendency to rely too much on Dr.
                             Masters' testimony and give it too much weight.  If
                             you want the jury admonished to disregard it, I am
                             happy to do that.

[DEFENSE COUNSEL]:            That's what I am asking for, Your Honor.  Thank
                             you.

[THE PROSECUTOR]:            And I would like to see this well known law that
                             maybe [defense counsel] can show as to the
                             relevancy here.  It is the question as to whether or
                             not this doctor relied upon the other doctors view of
                             - - particularly the petechiae that Dr. Cooper was
                             indicating.  He's all wrong.

THE COURT:                    But he can rely on that without additionally
                             equating Dr. Masters with John F. Kennedy, or
                             indicating that he regards him in the highest awe
                             and regard.

[THE PROSECUTOR]:            Well, it depends.  When we say if Dr. Resk was to
                             depend on Dr. Cooper, not knowing Dr. Cooper,
                             that is one thing, as opposed to somebody that he
                             highly respects, that has a good reputation in the
                             community, and has a great deal of experience in
                             determining whether or not this is truly petechiae

-22-

| | |
|---|---|
| | that has become an issue in this case, that Dr. Cooper is disputing Dr. Masters' observation of these various artifacts as either petechiae or something else.  That's what Dr. Cooper has been saying, they are something else.  Dr. Masters was wrong. |
| THE COURT: | And Dr. Resk says he does trust Dr. Masters' conclusions regarding those petechiae.  I am just saying that he can indicate that he puts credence in what Dr. Masters said without comparing him to John F. Kennedy.  He's already said it.  I would be toning it down a little bit.  You can't really eradicate that from the minds of the jurors. |
| [THE PROSECUTOR]: | In the relative weighing of one expert's opinion that another expert relies on, I think certainly the jury should know what this doctor, in his mind - - |
| THE COURT: | He can testify that he places great weight on Dr. Masters' opinions because of his great respect for Dr. Masters personally. |
| [THE PROSECUTOR]: | Great respect on his personally doesn't - - he's not a compatriot.  He is not a person that is with Dr. Masters.  He's going with Dr. Masters reputation within the community. |
| [DEFENSE COUNSEL]: | It doesn't make Dr. Masters the JFK or Obi Wan Kenobi of the forensic and pathology field. |
| [THE PROSECUTOR]: | In this doctor's mind. |
| THE COURT: | In Dr. Resk's mind, he occupies that position. |
| [DEFENSE COUNSEL]: | Your honor, if that was the reason indeed that Mr. Ramsey was eliciting that sort of reputation testimony, what I see coming is his asking Dr. Resk what his knowledge of Dr. Cooper's reputation. |
| [THE PROSECUTOR]: | I don't intend to. |
| THE COURT: | Can we leave it at that?  We will leave the testimony in, and I won't comment on it with the jury. |

RT at 1335-1338.

\\\\\

1    Respondent contends that the state appellate court's determination that this claim

2    was procedurally defaulted due to defense counsel's failure to make re-request a jury

3    admonishment now bars petitioner from seeking federal habeas corpus relief on his claim.  As a

4    general rule, a federal court sitting in habeas corpus "will not review a question of federal law

5    decided by a state court if the decision of that court rests on a state law ground that is independent

6    of the federal question and adequate to support the judgment." Calderon v. United States District

7    Court, 96 F.3d 1126, 1129 (9th Cir. 1996) (citing Coleman v. Thompson, 501 U.S. 722, 729

8    (1991)).  For a state procedural rule to be independent, the state law basis for the decision must

9    not be interwoven with federal law.  LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001).  To

10   be deemed adequate, it must be well established and consistently applied.  Poland v. Steart, 169

11   F.3d 575, 577 (9th Cir. 1999).  Whether a state procedural rule is independent and adequate, thus

12   precluding federal review, "is itself a federal question" to be reviewed de novo. Douglas v.

13   Alabama, 380 U.S. 415, 422 (1965).

14   The Ninth Circuit has recognized and applied California's contemporaneous

15   objection rule, section 353 of the California Evidence Code, which provides that a criminal

16   defendant must make a timely objection to the admission of evidence at trial in order to preserve a

17   claim challenging that evidence on appeal, as grounds for denying a federal habeas corpus claim

18   under the doctrine of procedural default where there was a failure to object at trial.  See, e.g.,

19   Inthavong v. Lamarque, 420 F.3d 1055, 1058 (9th Cir. 2005); Paulino v. Castro, 371 F.3d 1083,

20   1092-1093 (9th Cir. 2004); Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002) (citing

21   Garrison v. McCarthy, 653 F.2d 374, 377 (9th Cir. 1981)); Vansickel v. White, 166 F.3d 953, 957

22   (9th Cir. 1999); Bonin v. Calderon, 59 F.3d 815, 842-843 (9th Cir. 1995).  Under the

23   contemporaneous objection rule, California courts construe broadly the sufficiency of objection

24   that preserve issues for appellate review, focusing on whether the trial court had a reasonable

25   opportunity to rule on the merits of the objection.  Melendez, 288 F.3d at 1125.

26                                                -24-

Once the state has pleaded the existence of an independent and adequate state procedural ground as an affirmative defense, as respondent has in this case, the burden shifts to Petitioner to place the adequacy of that procedural rule in question. <u>Bennett v. Mueller</u>, 322 F.3d 573, 586 (9th Cir. 2003). He "may satisfy this burden by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule." <u>Id</u>. Thereafter, the state retains the ultimate burden of proving adequacy of the asserted bar. <u>Id</u>. at 585-586.

To the extent that petitioner urges that he *did* make a contemporaneous objection, he misses the point. Yes, he did make such an objection, but the default was not imposed because of the failure to make an objection. Although the appellate court expressly found that petitioner could have "objected further," the default  was imposed for failure to follow-up with his initial request that the jury be admonished when the court indicated that it wished not to give such an admonishment after having initially providing that one would be given. However, petitioner does also urge that under the circumstances, imposition of a default on the issue of the State's expert vouching for the State's other expert is not justified.

The way habeas corpus actions are briefed makes fulfillment of the <u>Bennett</u> paradigm difficult – at least as far as respondent is concerned. In answering the petition, respondent identifies and requests implementation of the bar.   Petitioner specifically disputes same in his traverse by pointing out that the request to admonish was made/accepted by defense counsel and then not renewed, but respondent has no further, automatic opportunity to fulfill the required burden in establishing the regularity of the bar under the circumstances proffered without a special request to do so. Thus, as is the case here, respondent's burden is not met. While there was additional briefing requested by Judge Sorrentino on the merits of the issue, she did not request further briefing on the default part of the issue. Although a bit unfair, respondent risks "defaulting on the default" argument by not requesting an opportunity to satisfy his burden. The

1    undersigned nevertheless finds that respondent has not met his burden and goes onto the merits.[4]

2                           **2.  Merits of Petitioner's Claim**

3                 Petitioner claims that the trial court erred by allowing one expert witness to testify

4    regarding the favorable professional reputation of another expert witness.  The pathologist who

5    had conducted the victim's autopsy, Dr. Joseph Masters, testified as an expert witness during the

6    prosecution's case in chief and described the victim's cause of death as asphyxia associated with

7    manual strangulation.  The defense subsequently presented its own expert witness, Dr. John

8    Cooper, another pathologist, who opined that the victim choked to death on aspirating stomach

9    contents.  In rebuttal, the prosecution called another expert witness, pathologist Dr. Tom  Resk.

10   As set forth above, the prosecutor questioned Dr. Resk regarding his knowledge of Dr. Masters'

11   professional reputation.  Over defense counsel's objection, Dr. Resk was permitted to respond that

12   Dr. Masters was essentially the "John F. Kennedy" or "Obi-Wan Kenobi" of the forensic

13   community "in terms of his integrity, competence and ability."  RT at 1332.  Dr. Resk then went

14   on to opine that when Dr. Masters made autopsy findings regarding the presence of certain

15   physical characteristics on a deceased person's body, one could "bank" on his conclusions.  RT at

16   1334.  Petitioner argues that Dr. Resk's testimony improperly bolstered the credibility of Dr.

17   Masters' earlier testimony in the eyes of the jury and directly usurped the fact-finding role of the

18   jury.

19                 Petitioner has a point, but only to a small degree in this federal habeas action, that

20   the testimony was entirely improper under state law.  See Cal. Evidence Code 1104 (evidence of

21   care or skill inadmissible to prove quality of conduct on a specific occasion).  See also cases cited

22   \\\\\

23   _____

24        [4]The undersigned does not find that respondent anticipated the "regularly applied" burden
     in the answer.  The section on procedural bar merely identifies the bar at issue, and cites several
25   cases which in general would authorize the bar.

26                                            -26-

in petitioner's supplemental brief.[5]  However, to the extent that petitioner premises his claim on alleged violations of state law or procedure, or errors in its application, no relief is available.  The California court's interpretation and application of its own law is binding on this court.  See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").  In this case, without citation of authority, the Court of Appeal alternatively  found that Dr. Resk's statements were not improper.  Although not citing state law, the appellate court was making an authoritative statement that no improper vouching occurred.  This is the end of then matter as far as state law is concerned.

The federal issue posited by the circumstances is either a "fundamental error" in receiving evidence, Estelle v. McGuire, 502 U.S. at 70, i.e., one that robs the trial verdict of any credibility, or a subset of  prosecution vouching error.  Courts have viewed the situation both ways.  See United States v. Sanchez-Lima, 161 F.3d 545, 548 (9th Cir. 1998) (evidence error in undue bolstering of a witness' credibility); United States v. Candoli, 870 F.2d 496, 505-506 (9th Cir. 1989) (asking an expert about another expert's reputation in field of expertise, a character evidence error); but see United States v. Moran, 493 F.3d 1002, 1009 (9th Cir. 2007) (prosecutor misconduct to elicit testimony on the veracity of a witness).  Petitioner reasonably chooses the improper character evidence route.  However, the undersigned must find, in order to recommend a granting of the petition, that the appellate court was unreasonable in concluding that no fundamental error in admitting the evidence occurred.

First, although it appears that the Supreme Court in Estelle endorsed the possibility

---

[5]The nature of the "rebuttal" evidence as that term is commonly known was also objectionable.  Generally, evidentiary rebuttal is reserved for those issues on which a party could not have reasonably anticipated testimony for presentation in the case in chief.  Here, the prosecution reserved calling Dr. Resk for the *express* purpose of being a "tiebreaker."  RT 1315.  However, the defense did not object on this point, and the undersigned considers it no further.

1  that admission of prejudicial or irrelevant evidence could so infect the fairness of a trial, that the

2  Due Process Clause would prohibit it, AEDPA jurispridence has countermanded that

3  endorsement.

> Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by "clearly established Federal law," as laid out by the Supreme Court. 28 U.S.C. § 2254(d). In cases where the Supreme Court has not adequately addressed a claim, this court cannot use its own precedent to find a state court ruling unreasonable. *Musladin*, 549 U.S. at 77, 127 S.Ct. 649.
> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, see *Williams*, 529 U.S. at 375, 120 S.Ct. 1495, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ. Absent such "clearly established Federal law," we cannot conclude that the state court's ruling was an "unreasonable application." *Musladin*, 549 U.S. at 77, 127 S.Ct. 649. Under the strict standards of AEDPA, we are therefore without power to issue the writ on the basis of Holley's additional claims

13  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that the evidentiary error

14  would otherwise have been actionable, see footnote 2 of the opinion).

15        Nothing has changed since Holley in the legal landscape which would permit the

16  undersigned to analyze the merits of an evidentiary claim.  See Greer v. Martel, 2012 WL 907215

17  (9th Cir. 2012).  Thus, no matter how outrageous petitioner believes the vouching to be, it is not

18  actionable.[6]

19  \\\\\\

20

21        [6]It is somewhat perplexing to find that admission of evidence which fundamentally infects a trial with unfairness is generally actionable under Supreme Court precedent, Estelle, supra, but that since that court has not specified a circumstance which would constitute fundamental unfairness, the habeas court may not assess the prejudicial nature of the evidence.  Because fundamental unfairness can only be determined on a case by case basis, assessing the circumstances under which evidence was admitted, and weighing prejudice against the evidence admitted as a whole, it is not likely that the Supreme Court will ever make a finding applicable to another case.  See Garza v. Yates, 2012 WL 1376990 (9th Cir. 2012) (Reinhardt, J. concurring).

26                                            -28-

1       Even assuming that the undersigned is incorrect and could make a fundamental

2  unfairness assessment, the undersigned would not make that assessment in this case.  The

3  appellate court held that reliance on Dr. Masters by Dr. Resk was appropriate in Dr. Resk coming

4  to his opinion.  " Thus, it was proper for the trial court to allow Dr. Resk to explain why, in the

5  court's words, Dr. Resk 'place[d] great weight on Dr. Master's opinion because of his great

6  respect for Dr. Masters personally,' as opposed to agreeing with Dr. Cooper.  This was not

7  improper vouching for the opinion of another expert; it was simply explaining why the other

8  expert's opinion was an important component of Dr. Resk's conclusion regarding the cause of

9  death."  <u>People v. Faith</u>, 2009 WL 105690 (2009).

10       While Dr. Resk's comments about Dr. Masters' skills  were substantially

11  overdone, they were not entirely irrelevant to Resk's own opinion.  This was not a situation where

12  Dr. Masters was simply another retained expert who was opining on a previous pathologist's

13  factual observation at an autopsy, and Dr. Resk was called simply to enhance Masters' opinion.

14  Rather, Dr. Masters was *the* examining pathologist who had made factual finding upon which Dr.

15  Resk relied to formulate his opinion about the manner in which the death occurred (the ultimate

16  expert issue).  In this sense, although one can question the "rebuttal" nature of allowing  Dr. Resk

17  to testify at all, having been allowed to testify, Dr. Resk could explain why he adopted without

18  question the expert factual observations made by Dr. Masters at the time of the examination, i.e.,

19  in the view of this witness, Dr. Masters could never have made a mistake on the underlying

20  medical facts.[7]

21  \\\\\

22

---

23     [7]This would have been a much closer case if Dr. Resk was called merely to comment upon
Dr. Master's ultimate opinion that the victim's death occurred in the context of a strangulation as

24  opposed to a choking.  If this were the case, there was no legitimate view of Dr. Resk's opinion as
anything but vouching.  However,  Dr. Resk gave his own "independent" opinion on the ultimate

25  expert issue assertedly unaffected by his respect for Masters..

26                                             -29-

1    The Court of Appeal was not unreasonable in failing to recognize the overdone

2   comments as "fundamental evidentiary error."

3   **D. Photographic Evidence**

4    Petitioner claims that his federal right to due process of law was violated by the

5   trial court's admission into evidence of a photograph of the victim with one of her children.  He

6   argues that the photo should have been excluded because it was irrelevant to the case and because

7   it was highly prejudicial.  The California Court of Appeal, Third Appellate District, considered

8   and rejected petitioner's claim on direct appeal, explaining as follows:

> Over defendant's objections, the prosecutor introduced a photograph of the
> victim with one of her children.  Defendant contends that this photograph
> should have been excluded because it was irrelevant and unduly
> prejudicial.  We agree that the photograph should not have been admitted,
> but conclude that the error was harmless.
>
> "Courts should be cautions . . . about admitting photographs of murder
> victims while alive, given the risk that the photograph will merely generate
> sympathy for the victims. [Citation.] But the possibility that a photograph
> will generate sympathy does not compel its exclusion if it is otherwise
> relevant. [Citation.] The decision to admit victim photographs falls within
> the trial court's discretion and an appellate court will not disturb its ruling
> unless the prejudicial effect of the photographs clearly outweighs their
> probative value." (*People v. Harris* (2005) 37 Cal.4th 310, 331-332.)
>
> The prosecutor sought to introduce a family photograph depicting the
> victim, her two children, and her father.  Defendant objected under
> Evidence Code section 352, asserting the photograph was irrelevant to any
> issue at trial and likely to create undue sympathy.
>
> The court ruled, "I am going to allow the photo.  It represents a photograph
> of the deceased when she was alive.  It's relatively recent, compared to the
> date of her demise."  However, the court ordered the prosecutor to edit the
> photograph to remove images of the victim's father and her newborn child
> because the images were "superfluous."
>
> The prosecutor showed the cropped photograph to Peggy F., the victim's
> aunt, during her testimony.  Defendant again objected, noting that there
> was no issue of identity, but the trial court permitted the photograph to be
> shown.  Peggy identified the victim and her seven-year old daughter as the
> people in the photograph.

\\\\\

-30-

Defendant asserts that the photograph should have been excluded because it was irrelevant to any issues at trial. We agree. "There was no dispute as to the identity of the person killed - - evidently the only issue on which the photograph was relevant - - and therefore the photograph should have been excluded because it bore on no contested issue." (*People v. Hendricks* (1987) 43 Cal.3d 584, 594.) Neither the prosecution nor the trial court explained what possible probative value the photograph had, and we can think of none.

However, the error in admitting the photograph was harmless. The case against defendant was strong, and it is highly unlikely that the jury was swayed by sympathy rather than evidence that had been presented. It is not reasonably probable that a result more favorable to defendant would have resulted in the absence of error, and consequently reversal is not warranted. (*See People v. DeSantis* (1992) 2 Cal.4th 1198, 1231.)

Lodged Doc. 4 at 13-14 (People v. Faith, 2009 WL 105690).

Once again, "it is not the province of a federal habeas court to reexamine state court determinations on state law questions." Estelle v. McGuire, 502 U.S. at 67. Because federal habeas corpus relief does not lie for state law errors, a state court's evidentiary ruling is grounds for federal habeas corpus relief only if it renders state proceedings so fundamentally unfair as to violate due process. Drayden v. White, 232 F.3d 704, 710 (9th Cir. 2000). While, in this case, the admission of the photograph and identification was improper, petitioner does not demonstrate how it rendered his trial fundamentally unfair. As previously discussed, no clearly established federal law holds that the admission of irrelevant or overly prejudicial evidence constitutes a due process violation sufficient to mandate federal habeas corpus relief. See Holley v. Yarborough, 568 F.3d at 1101. Moreover, in light of the strength of the evidence presented against petitioner at his trial, he cannot establish that admission of the photograph had a substantial and injurious effect or influence on the jury's verdict. Brecht v. Abrahamson, 507 U.S. at 638.

Petitioner is not entitled to federal habeas corpus relief on this claim.

**E. Cumulative Error**

Petitioner claims that the cumulative effect of the errors at trial, discussed above, deprived him of his right to due process and rendered his trial fundamentally unfair.

-31-

1          In some cases, the combined effect of multiple trial errors may give rise to a due

2    process violation if the trial was rendered fundamentally unfair, even where each alleged error

3    considered individually would not require reversal.  Parle v. Runnels, 505 F.3d 922, 927 (9th Cir.

4    2007) (citing Donnely v. Dechritoforo, 416 U.S. 637, 643 (1974); Chambers v. Mississippi, 410

5    U.S. 284, 290 (1973)).  The fundamental question in determining whether the combined effect of

6    trial errors violated a defendant's due process rights is whether the errors rendered the criminal

7    defense "far less persuasive," Chambers, 410 U.S. at 294, and thereby had a "substantial and

8    injurious effect or influence" on the jury's verdict.  Parle, 505 F.3d at 927 (quoting Brecht, 507

9    U.S. at 637).

10          However, an assessment of cumulative error does not permit this court to render its

11    own opinions on state law errors.  The court is aware of no authority in the habeas context which

12    permits the federal court to make state law violation assessments which it is forbidden to do when

13    reviewing the claims directly and singularly.  If however, a state court in the last reasoned

14    decision identifies errors in the admission of evidence under state law, the federal court may

15    assess the cumulative prejudice of those errors giving the state court AEDPA deference on that

16    court's ultimate cumulative error assessment.

17          "[C]umulative error analysis should evaluate only the effect of matters determined

18    to be error, not the cumulative effect of non-errors."  United States v. Rivera, 900 F.2d 1462, 1471

19    (9th Cir. 1990).  As discussed above, petitioner has suffered no errors of a federal constitutional

20    magnitude, and only one, found, *substantive* evidence error under state law.  Thus, there is no

21    combined effect of errors to be reviewed.[8]

22

23    _____

24          [8]The appellate court also found a timing error in the admission of some otherwise admissible
       hearsay statements.  A timing error, i.e., procedural only, cannot possibly be said to add any
25    prejudice to accumulate in a cumulative error analysis.  In any event, the appellate court's own
       cumulative error analysis (including the timing error) was in no way AEDPA unreasonable.

26                                          -32-

1    Petitioner is not entitled to federal habeas corpus relief on this claim.

2    **VI.  CONCLUSION**

3    For all of the foregoing reasons, the petition should be denied.  Pursuant to Rule 11

4  of the Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of

5  appealability when it enters a final order adverse to the applicant.  A certificate of appealability

6  may issue only "if the applicant has made a substantial showing of the denial of a constitutional

7  right."  28 U.S.C. § 2253(c)(2).  For the reasons set forth in these findings and recommendations,

8  a substantial showing of the denial of a constitutional right has not been made in this case.

9    Accordingly, IT IS HEREBY RECOMMENDED that:

10    1.    Petitioner's June 28, 2010 petition for writ of habeas corpus

11          pursuant to 28 U.S.C. § 2254 be denied; and

12    2.    The District Court decline to issue a certificate of appealability.

13    These findings and recommendations are submitted to the United States District

14  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

15  one days after being served with these findings and recommendations, any party may file written

16  objections with the court and serve a copy on all parties.  Such a document should be captioned

17  "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

18  within the specified time waives the right to appeal the District Court's order.  Martinez v. Ylst,

19  951 F.2d 1153 (9th Cir. 1991).  Any reply to the objections shall be filed and served within seven

20  days after service of the objections.

21  DATED: June 22, 2012

22

23                            /s/ Gregory G. Hollows
                        UNITED STATES MAGISTRATE JUDGE
24

jh/ggh
25

26                              -33-